# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

COIT CAPITAL SEC., LLC,    )
       )
       Plaintiff,   )
       )
v.       )   C.A. No. N17C-05-020 PRW CCLD
       )
TURBINE ASSET       )
HOLDINGS, LLC, *et al.*,       )
       )
       Defendants.  )

Submitted: May 15, 2019
Decided: August 21, 2019

## MEMORANDUM OPINION AND ORDER

*Upon Plaintiff's Motion to Dismiss Defendants' Securities Acts Counterclaim,*
**GRANTED.**

Stephen D. Dargitz, Esquire, Corinne E. Amato, Esquire (argued), Prickett, Jones & Elliot, P.A., Wilmington, Delaware, Counsel for Plaintiff Coit Capital Securities, LLC.

David A. Felice, Esquire (argued), Bailey & Glasser, LLP, Wilmington, Delaware, James H. Billingsley, Esquire (*pro hac vice*) (argued), Ashley N. Gould, Esquire (*pro hac vice*), Polsinelli PC, Dallas, Texas, Attorneys for Defendants Turbine Asset Holdings, LLC and Turbine Inventory Holdings CC3, LLC.

**WALLACE, J.**

## I. INTRODUCTION AND PROCEDURAL HISTORY

Plaintiff Coit Capital Securities, LLC, filed an amended complaint in February 2018[1] against Turbine Asset Holdings, LLC ("TAH"), Turbine Asset Holdings Group LLC ("TAHG"), Turbine Inventory Holdings CC1, LLC ("TIH1"), Turbine Inventory Holdings CC2, LLC ("TIH2"), Turbine Inventory Holdings CC3, LLC ("TIH3"), JSS Holdings Group, LLC ("JSS"), Credit Suisse Asset Management, LLC ("Credit Suisse Management"), Credit Suisse Securitized Products Fund L.P. ("Credit Suisse Products," and together with Credit Suisse Management, "Credit Suisse"), Wilmington Savings Fund Society, FSB, d/b/a Christiana Trust ("Christiana Trust"), and United Technologies Corporation, Pratt & Whitney Division ("Pratt & Whitney").[2]

Generally speaking, Coit alleges that these named Defendants engaged in a conspiratorial scheme designed to deprive Coit of: (1) its share of the proceeds from the sale of certain aircraft parts and inventory for which Coit helped to secure financing; and (2) opportunities to partake in future business transactions of the same nature.

---

[1]     Coit filed its original complaint in May 2017.

[2]     TAH, TAHG, TIH1, TIH2, TIH3, JSS, Credit Suisse Management, Credit Suisse Products, Christiana Trust, and Pratt & Whitney are herein referred to collectively as "Defendants."

Coit's amended complaint charges:

a.  Breach of Contract against TAH and TIH3 ("Count I");

b.  Breach of the Implied Contractual Covenant of Good Faith and Fair Dealings against TAH and TIH3 ("Count II");

c.  Unjust Enrichment against TAHG, TIH1, TIH2 and JSS ("Count III");

d.  Tortious Interference with Contract against Credit Suisse ("Count IV");

e.  Tortious Interference with Prospective Business Relations against Credit Suisse ("Count V");

f.  Aiding and Abetting Tortious Interference with Contract and Prospective Business Relations against Christiana Trust and Pratt & Whitney ("Count VI"); and

g.  Civil Conspiracy against Co-Conspirators TAH, Pratt & Whitney, Credit Suisse and Christiana Trust ("Count VII").

The many first-named Defendants filed earlier motions to dismiss Coit's amended complaint.[3] And the Court did dismiss Coit's Count III (Unjust Enrichment) against TAHG, TIH1, TIH2 and JSS, and Coit's Count VI (Aiding and Abetting Tortious Interference with Contract and Tortious Interference with Prospective Business Relations) against Christiana Trust. In addition, TAHG, TIH1, TIH2 and JSS were dismissed from the action altogether.[4]

---

[3]  TAH, TAHG, TIH1, TIH2, TIH3, and JSS moved to dismiss Counts II, III and VII of the Amended Complaint. Credit Suisse moved to dismiss Counts IV, V, and VII of the Amended Complaint. Christiana Trust moved to dismiss Counts VI and VII of the Amended Complaint. Pratt & Whitney moved to dismiss Counts VI and VII of the Amended Complaint. Coit opposed each of these motions.

[4]  D.I. 95.

In its answer, TAH and TIH3 (collectively, the "Turbine Defendants") asserted affirmative defenses of laches and unclean hands. The Turbine Defendants also brought two counterclaims against Coit. First, they allege that Coit has defamed them through the allegations made in Coit's amended complaint in the instant action (the "Defamation Counterclaim").[5] Second, the Turbine Defendants claim that Coit violated the state Securities Acts of Texas and Delaware by failing to register as a broker-dealer in connection with the aircraft financing transactions it participated in (the "Securities Acts Counterclaim"). As a result, the Turbine Defendants say, the agreements evidencing 50/50 profit-sharing between them and Coit are void and unenforceable.

## II. THE ALPHABET SOUP OF PARTIES AND ACTORS

Coit is a privately held brokerage firm that provides structured finance and investment banking services.[6] Coit Capital Management, LLC, is a registered investment advisor with the same ownership structure as Coit.[7]

TAH is a Delaware limited liability company with its principal place of business in Connecticut.[8] TAH was formed in 2012 by Ted Glassman and Chad

---

[5] The Defamation Counterclaim was dismissed by prior order. D.I. 179 and 191.

[6] Coit's First Am. Compl. ¶ 9 (Feb. 16, 2018) (D.I. 22) [hereinafter, "Am. Compl."].

[7] *Id.*

[8] *Id.* ¶ 10.

Stanford, each of whom possess a 50% interest in TAH.[9] TAH is in the business of purchasing and selling engines and engine parts for commercial turbine aircrafts.[10]

TAHG is also a Delaware limited liability company with its principal place of business in Connecticut.[11] TAHG was formed in 2014 by Glassman, Stanford and Robert Stanford (on behalf of Zenith Aviation, Inc.), each of whom owns a 33% interest in TAHG.[12] TAHG was formed for the purpose of continuing TAH's business of buying and selling aircraft engine parts.[13] In connection with the formation of TAHG, TAH agreed to wind down and terminate its operations upon completion of its existing transactions for aircraft engines and parts.[14]

TIH1, TIH2, TIH3 and JSS are each special-purpose Delaware limited liability companies that are wholly owned by TAH.[15] TIH1 was used in connection with a portfolio transaction for engine parts consummated on September 30, 2013.[16]

---

[9] *Id.*

[10] *Id.*

[11] *Id.* ¶ 11.

[12] *Id.*

[13] *Id.*

[14] *Id.* ¶ 10.

[15] *Id.* ¶ 12-15.

[16] *Id.* ¶ 12.

TIH2 was used in connection with a portfolio transaction for engine parts consummated on December 20, 2013.[17] TIH3 was used in connection with a portfolio transaction for engine parts consummated on March 27, 2014.[18] JSS was used in connection with a portfolio transaction for engine parts consummated on December 14, 2015.[19]

Credit Suisse Management is a Delaware limited liability company and the Investment Manager of Credit Suisse Products.[20] James Drvostep is employed as a fund manager at Credit Suisse Management.[21] Credit Suisse Products is a Delaware limited partnership that acts as a hedge fund in the financial services industry.[22]

Christiana Trust is a division of Wilmington Savings Fund Society, FSB, a Delaware corporation and a wholly owned subsidiary of WSFS Financial Corporation.[23] Christiana Trust provides trust, asset management and agency services.[24]

---

[17] Am. Compl. ¶ 13.

[18] *Id.* ¶ 14.

[19] *Id.* ¶ 15.

[20] *Id.* ¶ 16.

[21] *Id.*

[22] *Id.* ¶ 17.

[23] *Id.* ¶ 18.

[24] *Id.*

Pratt & Whitney is a Delaware corporation and one of the world's leading suppliers of aircraft engines.[25] Pratt & Whitney also provides fleet management services and aftermarket maintenance and repair services to major airline carriers.[26] Mike Coleman is employed as a sales manager at Pratt & Whitney.[27]

## III. FACTUAL BACKGROUND

The Court derives this factual recitation from the allegations in Coit's amended complaint, the Turbine Defendants' answer and counterclaims, documents incorporated by reference or integral to those pleadings, the parties' filings related to the instant motion and judicially noticeable facts.[28] As the Court must, it has accepted as true the counterclaims' well-pled factual allegations and has drawn all reasonable inferences from those allegations in the Turbine Defendants' favor.[29]

### A.    THE EARLY DISCUSSIONS OF THE PORTFOLIO TRANSACTIONS.

Representatives of Coit first met with Glassman in 2011 to discuss the purchase of a cargo aircraft and the lease of the aircraft to an international carrier

---

[25]    *Id.* ¶ 19.

[26]    *Id.*

[27]    *Id.* ¶ 19.

[28]    While there is some divergence on certain details, there is no disagreement on the facts significant to this motion's disposition.

[29]    *Spence v. Funk*, 396 A.2d 967, 968 (Del.1978); *Ramunno v. Cawley*, 705 A.2d 1029, 1034 (Del.1998).

company.[30] Glassman was looking for an entity to fund the deal and identified Coit as a potential source.[31] Although the deal never came to fruition, Glassman continued to keep Coit apprised of other potential aviation transactions.[32]

After the formation of TAH in June 2012, Glassman approached Coit regarding the financing of potential Pratt & Whitney portfolio transactions on TAH's behalf.[33] Glassman explained the transaction structure and its benefits as follows:[34]

- TAH would purchase a portfolio of aircraft engines and engine parts from Pratt & Whitney, but Pratt & Whitney would retain possession of the parts pursuant to an inventory management agreement with the authority to resell those parts to third parties.[35]

- This structure permitted Pratt & Whitney to recognize the portfolio sales as "true sales," thereby permitting Pratt & Whitney to remove certain inventory from its books to improve its revenue figures for the fiscal year.[36]

---

[30] Am. Compl. ¶ 23.

[31] *Id.*

[32] *Id.*

[33] *Id.* ¶ 24.

[34] *Id.*

[35] *Id.*

[36] *Id.* ¶¶ 24-25 ("The portfolio transactions diminish the adverse impact of P&W's extensive inventory base by allowing P&W to record sales of its inventory, recognize the revenue from those sales, but still physically hold the engines and engine parts for use in its maintenance contracts as needed.").

- As the purchaser of the portfolio, TAH would profit from Pratt & Whitney's resale of the engines and parts to third parties.[37]

- If Coit were to secure the financing for the portfolio transactions, TAH would agree to share the proceeds from Pratt & Whitney's resale of the assets with Coit on an equal basis.[38]

In early 2013, a Pratt & Whitney portfolio transaction emerged for which TAH sought Coit's assistance in securing approximately $10 million to fund the purchase.[39] Coit secured a financing commitment from an investor who, through no fault of Coit, unexpectedly backed out of the deal just before closing.[40] TAH nonetheless remained interested in working with Coit because Coit was amenable to a 50-50 split and Coit could provide financing contacts capable of funding large transactions.[41]

## B.    THE PORTFOLIO TRANSACTIONS: CC1, CC2, CC3.

With the promise of future deals on the horizon, Coit identified Credit Suisse as an interested investor and contacted its fund manager, Drvostep, to discuss a

---

[37]    *Id.* ¶ 26.

[38]    *Id.* ¶ 27.

[39]    *Id.* ¶ 28.

[40]    *Id.*

[41]    *Id.* ¶ 30 ("On prior P&W deals, TAH only achieved limited management fees and approximately 10% of the profits.").

potential investment.[42] Drvostep expressed interest in participating in the Pratt & Whitney portfolio transactions.[43] Accordingly, when Coit learned from TAH that Pratt & Whitney had made a portfolio of assets available, Coit contacted Drvostep who subsequently agreed to finance the transaction.[44] That transaction, known as "CC1" to Coit, was later consummated for $5 million in September 2013.[45]

Nearly a week before the CC1 transaction closed, on September 24, Coit and TAH executed a letter agreement for the CC1 transaction to confirm the parties' 50-50 profit-sharing agreement (the "September 2013 Letter Agreement").[46] CC1 was structured such that TAH bought aircraft engines and engine parts from Pratt & Whitney, who maintained physical possession in order to market the engines and parts for sale.[47] TAH would assign its interest in the engines and parts to TIH1, which would then use the funds from Credit Suisse to pay Pratt & Whitney for the inventory. Under the 50-50 profit-sharing terms of the September 2013 Letter

---

[42] *Id.* ¶ 31. Drvostep managed both domestic and offshore investments with Credit Suisse. *Id.*

[43] Am. Compl. ¶ 32.

[44] *Id.* ¶ 33.

[45] *Id.* ¶ 34. The Turbine Defendant refer to this portfolio transaction as "TAH4."

[46] *Id.* ¶ 35.

[47] *Id.* ¶ 38.

Agreement, any proceeds recognized by Pratt & Whitney from this sale would be distributed evenly between Coit and TAH.

On September 30, 2013, TAH, TIH1, Credit Suisse, Christiana Trust and Pratt & Whitney consummated CC1 via numerous instruments relating to the CC1 transaction, including a Loan and Security Agreement.[48] Coit was neither party to nor bound by the terms of any of these agreements governing CC1.[49] The Loan and Security Agreement, executed by and among TIH1, Credit Suisse and Christiana Trust, set forth the cash flow priority for distribution of proceeds from the sale of assets in the CC1 portfolio. Under the Loan and Security Agreement, any proceeds from Pratt & Whitney's sale of the engines and parts would be remitted to Christiana Trust as the trustee. Christiana Trust would then be responsible for distributing the proceeds in order of priority.[50]

---

[48]    Am. Compl. ¶¶ 37-38.

[49]    *Id.* ¶ 38. The closing documents included: (i) a Purchase Order under which TAH bought the parts from Pratt & Whitney; (ii) an Engine Parts Storage and Management Service Agreement (the Inventory Management Agreement, or "IMA") under which Pratt & Whitney maintained physical possession of the engines and parts to market for sale to third parties; and (iii) an Inventory Purchase Agreement, under which TAH assigned its interest in the engines and parts to TIH1 and TIH1 used the funds from Credit Suisse to pay Pratt & Whitney for the inventory. *Id.*

[50]    *Id.* ¶¶ 39-40. The priority was: (1) Christiana Trust fees and expenses; (2) interest and unpaid principal owed to Credit Suisse; (3) any other accrued obligations; and then (4) the amounts, if any, payable under the September 2013 Letter Agreement. Section 5(b) of the Loan and Security Agreement recognizes and confirms the terms of the September 2013 Letter Agreement in that it provides that Coit is to be paid any amounts due and owing under the September 13 Letter Agreement prior to any distributions to TIH1. *Id.*

-10-

On December 30, 2013, with the CC1 transaction structure serving as a template, TAH purchased a second portfolio of plane engines and parts from Pratt & Whitney for approximately $28 million (referred to as "CC2").[51] TAH then sold the CC2 portfolio of engines and parts to TIH2—its newly created, wholly owned subsidiary.[52] As with the first transaction, Coit and TAH executed a letter Agreement wherein they agreed to share the profits from the inventory involved in the CC2 transaction equally (the "December 2013 Letter Agreement").[53]

A third portfolio transaction ("CC3") followed in March of 2014, using terms and documentation substantially similar to the prior two transactions; this included a Loan and Security Agreement and terms of distribution.[54] Again, this documentation provided that the profits recognized from Pratt & Whitney's resale of the CC3 portfolio assets would be equally divided between TAH and Coit.[55] But unlike CC1 and CC2's letter agreements, that for CC3 (the "March 2014 Letter Agreement") was executed by Coit and TIH3, rather than TAH.[56] Additionally, the

---

[51] Am. Compl. ¶¶ 42-44. The Turbine Defendants refer to this portfolio transaction as "TAH6."

[52] Id.

[53] Id.

[54] Id. The Turbine Defendant refer to this portfolio transaction as "TAH7."

[55] Id. ¶ 44. This documentation also confirmed that distribution of proceeds to Coit were senior to any distributions of proceeds to TIH2 and TIH3. Id.

[56] Id. ¶ 43.

-11-

March 2014 Letter Agreement provided that TIH3 share profits with Coit on all transactions that TIH3 consummated from time to time.[57]

Following the success of the CC1, CC2, and CC3 portfolio transactions, Drvostep inquired whether Credit Suisse could share in a cut of the profits from TAH's sale of the portfolio assets.[58] Coit rejected this request.[59] Drvostep additionally sought to include one of Credit Suisse's offshore funds in a large-scale transaction.[60] This request demanded the involvement of a partner to ensure the investment was in compliance with applicable tax laws.[61] As a result, Coit arranged for a meeting between Glassman, Drvostep, and its contact, David Moran of PartnerRe, a Bermuda-based reinsurance company.[62] After the meeting, Glassman privately approached Moran and requested that Moran sign a non-circumvent agreement which stipulated PartnerRe would do business with TAH and not Coit

---

[57] *Id.* The March 2014 Letter Agreement "is intended to set forth the agreement between TIH[3] and Coit with regard to the purchase, financing and liquidation of jet engine parts acquired from [Pratt & Whitney] *as such may be consummated from time to time.*" (emphasis added).

[58] *Id.* ¶ 45 ("This yield was not only important for Credit Suisse but also had significant personal financial implications for Drvostep, whose compensation was tied to management fees and profits earned on the Credit Suisse funds that he managed.").

[59] *Id.*

[60] *Id.* ¶¶ 46-47.

[61] *Id.* ¶ 46.

[62] *Id.* ¶ at 47.

-12-

for any Pratt & Whitney transactions.[63]  Moran declined to sign the agreement and informed Coit of Glassman's offer.[64]

Coit, concerned with the future of its relationship with TAH, contacted Drvostep concerning Glassman's actions.[65]  Drvostep responded by reassuring Coit that it would be included in any future Pratt & Whitney portfolio transactions involving Credit Suisse and TAH.[66]  A follow-up phone call between Drvostep, Coit and TAH reinforced this verbal guarantee.[67]

By late 2014, relevant inventory management report analyses revealed that CC1 was not performing as anticipated and Credit Suisse was facing a loss of up to $1 million on the CC1 portfolio transaction.[68]  Because CC1, CC2 and CC3 were not cross-collateralized, any positive performances in CC2 and CC3 could not be used to cover the loss on CC1.[69]  Credit Suisse advised TAH and Coit that it would not participate in any future portfolio transactions unless and until the loss on CC1

---

[63]    *Id.*

[64]    *Id.*

[65]    Am. Compl. ¶ 48.

[66]    *Id.*

[67]    *Id.*

[68]    *Id.* ¶ 52.

[69]    *Id.* ¶ 54.

was mitigated.[70] In an effort to quell Credit Suisse's loss of confidence, Glassman assured Coit that he had ideas to remedy the CC1 loss.[71]

## C. THE ALLEGATIONS IN COIT'S AMENDED COMPLAINT.

Coit contends that CC1's underperformance created a unique opportunity for Credit Suisse and TAH to work together to advance their own interests.[72] Credit Suisse had already requested a share of the profits from any portfolio transactions, had previously expressed its desire for larger Pratt & Whitney portfolio transactions, and now sought to cover its losses from the CC1 transaction.[73] TAH had already attempted to exclude Coit from future portfolio transactions when Glassman proposed the non-circumvent agreement to Moran.[74]

---

[70] Am. Compl. ¶ 55. The anticipated $1 million loss created an extraordinarily high loan-to-value ("LTV") ratio for Credit Suisse on CC1. Used by lenders like Credit Suisse to gauge the amount of risk associated with their loans, an LTV ratio measures the amount of a loan divided by the appraised value of the asset purchased. Higher LTV ratios are viewed by lenders as high risk loans. With the anticipated loss on CC1, the LTV ratio for Credit Suisse in CC1 was 200%. Thus, the CC1 deficit provided Credit Suisse with leverage in its negotiations with Coit and TAH: if the loss on CC1 was not mitigated, Credit Suisse would not finance any future portfolio transactions. *Id.* ¶¶ 52-55.

[71] *Id.* ¶ 56. Glassman also offered to visit Coit in San Francisco to meet and discuss potential solutions. Glassman never followed through on these offers. *Id.*

[72] *Id.* ¶ 57.

[73] *Id.*

[74] *Id.*

-14-

Coit suggests that Credit Suisse and TAH had reason to benefit from excluding Coit from subsequent transactions. The opportunity to do so, Coit says, was presented to Credit Suisse and TAH in the form of a $78.5 million Pratt & Whitney portfolio transaction, referred to as the Waypoint transaction.[75]

TAH identified the Waypoint transaction in early 2015, and, without notifying Coit, directly contacted Credit Suisse for financing.[76] JSS, an affiliate of TAH, purchased the portfolio and a Credit Suisse subsidiary financed the transaction.[77] The Credit Suisse subsidiary also entered into a profit-sharing agreement with the TAH affiliate regarding the proceeds from the resale of the Waypoint portfolio assets.

In early May 2015 when Coit contacted Drvostep about CC1, CC2 and CC3, Drvostep cryptically claimed that Glassman and Stanford had forced him to write a check.[78] It wasn't until June 2015, after receiving Christiana Trust's May 2015 statement, that Coit discovered a $1.75 million advance from Credit Suisse dated May 20, 2015.[79] This amount, less the amount owed for legal fees, resulted in a

---

[75]   *Id.* ¶ 58. The Waypoint transaction was that for which the limited liability company, JSS, was formed.

[76]   *Id.* ¶ 58.

[77]   Credit Suisse's Op. Br. in Supp. of Mot to Dismiss at 10-11 (May 7, 2018) (D.I. 62).

[78]   Am. Compl. ¶ 61.

[79]   *Id.* ¶ 62.

$1.58 million distribution directly to TAH or one of its wholly owned subsidiaries TIH1, TIH2 or TIH3.[80] Coit received no share of that distribution.[81] Coit contacted Christiana Trust to notify the trustee of this distribution and to request information as to why the distribution had occurred. Coit received no response.[82] Thereafter, Coit received no more monthly statements from Christiana Trust.[83] And though Coit also contacted TAH for financial updates, Glassman never disclosed the $1.75 million distribution to Coit.[84]

Coit claims that Credit Suisse advanced Christiana Trust the $1.75 million to distribute to TAH to secure the Waypoint transaction.[85] In exchange, CC1, CC2 and CC3 were cross-collateralized and Credit Suisse replaced Coit as TAH's profit-sharing partner.[86] Coit also alleges—based on court filings from certain related Texas litigation—that TAH used the funds it received from Credit Suisse to bribe

---

[80]    *Id.*

[81]    *Id.*

[82]    *Id.* ¶ 63.

[83]    *Id.*

[84]    *Id.* ¶ 64.

[85]    *Id.* ¶¶ 65-66, 69.

[86]    *Id.* ¶ 66.

Coleman, a high-ranking Pratt & Whitney employee, to funnel the Waypoint deal to TAH and Credit Suisse.[87]

Coit further contends that after the CC1, CC2, and CC3 transactions were closed, TAH, Credit Suisse and Christiana Trust amended the terms of the September 2013 Loan Security Agreement on May 20, 2015.[88] This amendment altered the cash flow priority for distribution of proceeds from the sale of the assets in each transaction and resulted in Coit moving from fifth in priority to tenth.[89] The September 2013 Loan Security Agreement was further amended on June 30, 2015, by the CC4 Loan and Security Agreement, which was executed by TAH, Credit Suisse and Christiana Trust. Coit was not a party to the CC4 Loan and Security Agreement, and its effect caused Coit to move from tenth to twelfth in priority.[90] On September 30, 2015, TAH, Credit Suisse and Christiana Trust amended the September 2013 Loan and Security Agreement for the third time by completing the CC5 Loan and Security Agreement, which Coit was not a party to and which

---

[87]     *Id.* ¶ 67.

[88]     Coit's Answ. Br. in Opp'n to Defs.' Mot. to Dismiss at 12-13 (May 18, 2018) (D.I. 78).

[89]     *Id.* at 13.

[90]     *Id.* at 15.

provided that payments to Coit were tenth in priority.[91] In December 2015, JSS entered into an IMA with Pratt & Whitney.[92]

In essence, the Letter Agreements provide that if and when all other obligations were paid, Coit and TAH (and TIH3 in the case of the CC3 transaction) would share the remaining profits equally.[93] To date, Coit has received no payments on CC1, on CC2 or on CC3.[94]

## IV. APPLICABLE LEGAL STANDARDS

A party raising a statute of limitations defense to a claim or counterclaim may do so in a motion to dismiss when the pleadings themselves demonstrate that the questioned action was not brought within the applicable statutory period.[95] The Court accepts the allegations contained in the opposing party's pleading as true for purposes of such a motion.[96]

---

[91]     *Id.* at 16.

[92]     Turbine Defs.' Mot. to Dismiss at 15.

[93]     *Id.* at 4.

[94]     Am. Compl. ¶ 76.

[95]     *Verrastro v. Bayhealth Medical Center, Inc.*, 119 A.3d 676, 678 (Del. Super. Ct. 2015) (citing *Wilson v. Kirlin*, 2011 WL 1465576, at *1 (Del. Super. Ct. Apr. 15, 2011); *Brooks v. Savitch*, 576 A.2d 1329, 1330 (Del. Super. Ct. 1989)).

[96]     *Id.* (citing *Wilson*, 2011 WL 1464476, at *1).

## V. PARTIES' CONTENTIONS

The Turbine Defendants ask the Court to declare that the Letter Agreements are unenforceable and thus void as a matter of law because, in their view, Coit failed to register as securities brokers of as agents of brokers in either Delaware or Texas before selling "a security" to the Turbine Defendants or seeking compensation related to "a security."[97]

Coit seeks to dismiss the Securities Acts Counterclaim as untimely because any action for a purported violation of the Securities Act of either Delaware or Texas expired in March 2017.[98] Even if the Security Acts Counterclaim was timely filed, Coit argues that the claim itself fails as a matter of law because the actions in dispute did not involve the transfer of a "security" as defined by either state's Securities Act and so Coit was not required to register as a broker-dealer.[99] Lastly, Coit contends

---

[97] Turbine Defs.' Answ. and Countercl. at 31 (Sept. 5, 2018) (D.I. 98) [hereinafter, "Turbine Defs.' Countercl."].

[98] Coit notes that the Turbine Defendants failed to cite any provision of the Securities Acts that Coit allegedly violated and instead generally references "Chapter 65 of the Delaware Code," as support for the declaratory relief sought. Because 10 *Del. C.* § 6501 does not serve as an independent cause of action, Coit argues that this alone is grounds to dismiss. But, for purposes of this motion, Coit assumes that the Turbine Defendants intended to plead violations of 6 *Del. C.* § 73-302(a) and/or Tex. Rev. Civ. Stat. art. 581-12A. Coit's Op. Br. in Support of its Mot. To Dismiss the Countercl. of Turbine Defs. at 13 (Oct. 16, 2018) (D.I. 130) (citing Turbine Defs.' Countercl. at 31) [hereinafter, "Coit's Mot. to Dismiss"]; see *Hoechst Celanese Corp. v. Nat'l Union Fire Ins. Co.*, 623 A.2d 1133, 1136 (Del. Super. Ct. 1992) ("The declaratory judgment statute, 10 *Del. C.* § 6501, does not create any substantive rights but merely provides a procedural means for securing judicial relief in an expeditious and comprehensive manner.").

[99] Coit's Mot. to Dismiss at 14.

-19-

that the Turbine Defendants may not bring a private cause of action under either state's Securities Act because the Security Acts Counterclaim fails to allege (i) any injury to the Turbine Defendants as a result of Coit's purported failure to register, and (ii) that the Turbine Defendants are within the class of persons those Securities Acts were designed to protect.[100]

## VI. DISCUSSION

The three portfolio transactions at issue in the Securities Acts Counterclaim include: (1) CC1, which closed in September 2013; (2) CC2, which closed in December 2013; and (3) CC3, which closed in March 2014.[101] Under the Securities Acts of both Delaware and Texas, a civil action for failure to register as a broker-dealer must be brought within three years from the date of the sale.[102]

---

[100]  *Id.*

[101]  Am. Compl. ¶¶ 12-14. The Turbine Defendants argue that the transactions named in the Amended Complaint which arose in 2015 or later are not time-barred. Turbine Defs.' Answ. Br. at 6. But, as Coit correctly points out, the Securities Acts Counterclaim explicitly provides that it is specific to the Letter Agreements executed in connection with CC1, CC2, and CC3. Turbine Defs.' Countercl. ¶¶ 9-12, 16; *see* Coit's Reply Br. in Support of its Mot. to Dismiss the Countercl. of Turbine Defs. at 7 (Dec. 20, 2018) (D.I. 163) [hereinafter, "Coit's Reply Br."].

[102]  *See* DEL. CODE ANN. tit. 6, § 73-605(e)(2014) ("No person may sue under this section more than 3 years after the contract of sale."); TEX. REV. CIV. STAT. ANN. art. 581-33(H)(1)(a) (2014) ("No person may sue under [this section] . . . more than three years after the sale . . . ."). The Court need not engage in a conflict-of-law analysis because the "general rule is that the forum state's statute of limitations applies." *Pivotal Payments Direct Corp. v. Planet Payment, Inc.*, 2015 WL 11120934, at *3 (Del. Super. Ct. Dec. 29, 2015) (concluding that the general rule of applying the forum state's statute of limitations is consistent with the general principle that the procedural law of the forum state applies) (quoting *Furnari v. Wallpang, Inc.*, 2014 WL 1678419, at *4 (Del. Super. Ct. Apr. 16, 2014)); *Burrell v. Astrazeneca LP*, 2010 WL 3706584, at *4 (Del. Super. Ct. Sept. 20, 2010) ("Delaware courts have uniformly held that when a complaint alleging a cause of action that arose outside of Delaware is time-barred under the Delaware statute of limitations, the

-20-

For purposes of this particular argument in this motion, the parties agree that the Letter Agreements executed by Coit and the Turbine Defendants in connection to the closing of each of portfolio transaction serve as the only potential "security" for purposes of measuring the timeliness of claims arising under the Securities Acts.[103] Thus, the window for filing the Securities Acts Counterclaim appears to have expired in March 2017.

Coit moves to dismiss the Securities Acts Counterclaim as time-barred because it was filed in September 2018.[104]

The Turbine Defendants assert that the Securities Acts Counterclaim is not time-barred because it is "exclusively defensive" and arises from the same transactions in dispute in Coit's Amended Complaint.[105] Coit says the Securities Acts Counterclaim is hardly "exclusively defensive;" instead, it seeks affirmative

---

Court need not conduct a choice of law analysis and may apply the Delaware statute of limitations.").

[103] Coit's Mot. to Dismiss at 16.

[104] Coit's Mot. to Dismiss at 16 (citing *Huffington v. T.C. Group, LLC*, 2012 WL 1415930, at *10 (Del. Super. Ct. April 18, 2012) (stating that a securities violation claim filed outside of the statute of limitations is barred as a matter of law); *Stone v. Enstam*, 541 S.W.2d 473, 478 (Tex. Civ. App. 1976) (a claim brought under the Texas Securities Act more than three years after the execution of the sale contract is barred from recovery)).

[105] Turbine Defs.' Answ. Br. in Opp'n to Coit's Mot. to Dismiss Countercl. at 5-6 (Nov. 29, 2018) (D.I. 145) [hereinafter, "Turbine Defs.' Answ. Br."] (Turbine Defendants suggest that their prayer for declaratory judgment "stems from [Coit]'s attempt to enforce the illegal and unenforceable agreements, and is therefore exclusively defensive.").

relief in the form of a declaration that the Letter Agreements are void and/or unenforceable due to a supposed statutory violation.[106]

The Securities Acts Counterclaim relates to Coit's purported failure to register as a broker-dealer in 2013 and 2014. While the Amended Complaint alleges claims that arise, in part, from the Turbine Defendants' failure to pay Coit its equal share of the proceeds under the Letter Agreements executed in 2013 and 2014. So, the question posed here is whether the Amended Complaint which seeks damages arising from the breach of duties owed under the Letter Agreements tolled the statute of limitations as to the Turbine Defendants' counterclaim seeking a judgment declaring those same agreements unenforceable under the Delaware or Texas Securities Acts. It does not.

Here, the Amended Complaint asserts, *inter alia*, that the Turbine Defendants breached the Letter Agreements as well as the implied covenant of good faith and fair dealing, and engaged in a civil conspiracy.[107] Such claims arise from the Turbine Defendants' alleged involvement in a scheme which Coit contends was "deliberately designed" to deprive Coit of: compensation for its efforts in securing financing for CC1, CC2 and CC3; proceeds related to each transaction as memorialized in the

---

[106]    Coit's Reply Br. at 8. Coit further argues that the transactions' consummation and the Turbine Defendants' decision years later to deny Coit the proceeds do not rise out of the same transaction simply because they both generally concern the Letter Agreements. *Id.* at 9.

[107]    Am. Compl. ¶¶ 77-86.

-22-

respective Letter Agreements; and, opportunities to partake in future business.[108] In comparison, the Securities Acts Counterclaim asserts that because the transactions which Coit entered into to obtain such financing are "security" transactions, Coit and its agents were required to register as brokers and/or agents of brokers before selling or seeking compensation related to such "securities."[109] For this reason, Turbine Defendants now say, the Securities Acts Counterclaim validly seeks the Court's declaration that the Letter Agreements are unenforceable and void as a matter of law.[110]

The term "counterclaim" is generic and normally understood to include the defenses of recoupment and setoff.[111] Both of those seek in one way or another to diminish the damages that a plaintiff might recover—either by acknowledging the justice of the plaintiff's demand but setting up a defense that seeks monetary redress for plaintiff's alleged wrong committed in some other independent transaction between the two parties (sefoff); or by seeking reduction the plaintiff's damages via a claim that plaintiff, himself, hasn't met his cross-obligations under the same

---

[108] *Id.* ¶ 1.

[109] Turbine Defs.' Countercl. ¶¶ 10-14.

[110] *Id.* ¶ 14.

[111] *United States for Use & Benefit of Greenville Equip. Co. v. U.S. Cas. Co.*, 218 F. Supp. 653, 655 (D. Del. 1962).

contract (recoupment).[112] Valid recoupment counterclaims are not subject to statutes of limitations bars so long as the main action is timely.[113]

In sharp contrast, a request for declaratory relief is a claim seeking non-monetary, affirmative relief.[114] And any cross- or counterclaim for such affirmative relief must satisfy any applicable statute of limitations.[115]

The Court of Chancery's decision in *In re Delta & Pine Land Co. Shareholders Litigation*[116] is illustrative of the difference between a truly defensive counterclaim and an affirmative request for declaratory relief—and, the difference in the treatment of each under a statute of limitations.[117]

---

[112] *Finger Lakes Capital Partners, LLC v. Honeoye Lake Acquisition, LLC,* 151 A.3d 450, 453 (Del. 2016).

[113] *United States v. Dalm,* 494 U.S. 596, 605 (1990); *United States for Use & Benefit of Greenville Equip. Co.,* 218 F. Supp. at 655-56. On the other hand, Delaware statutory law bars setoff for amounts owed outside of the statute of limitations. *Finger Lakes,* 151 A.3d at 452 (discussing 10 *Del. C.* § 8120).

[114] *See Playtex Family Products, Inc. v. St. Paul Surplus Lines Ins. Co.,* 564 A.2d 681, 687 (Del. Super. Ct. 1989) (explaining that seeking declaratory relief under 10 *Del. C.* §§6501 *et seq.* means institution of an action to resolve a controversy: (1) involving the rights or other legal relations of the party seeking declaratory relief; (2) in which the claim of right or other legal interest is asserted against one who has an interest in contesting the claim; (3) which must be between parties whose interests are real and adverse; (4) for which the issue is be ripe for judicial declaration); *see also F.D.I.C. v. Sanders,* 785 F. Supp. 528 (W.D. Pa. 1992).

[115] *In re Delta & Pine Land Co.,* 2000 WL 1010584, at *4 (Del. Ch. July 17, 2000).

[116] *Id.*

[117] No doubt, the lines of differentiation between the two are neither clearly nor easily drawn and the application of the statute of limitations relies on the subtle differences in the specific form of relief sought and the facts and circumstances of the case. *See, e.g., PNC Bank, Delaware v. Turner,* 659 A.2d 222 (Del. Super. Ct. 1989); *Wilson v. Kirlin,* 2011 WL 1465576, at *2

-24-

In *In re Delta & Pine Land Co.*, the plaintiff shareholders filed a derivative claim against defendant Delta's board of directors and defendant Monsanto in connection with a failed merger between the two defendant companies.[118] In its cross-claim against Delta, Monsanto sought a judicial declaration that it was entitled to terminate the merger agreement and that it had no further obligations to Delta under the agreement.[119] In response to the cross-claim, Delta filed a motion to stay or dismiss in favor of its earlier-filed breach-of-contract action that was pending in another state's court.[120]

Although *In re Delta & Pine Land Co.* involved a markedly different issue than that presented here (and a party's request for a markedly different declaration than that here),[121] its analysis is helpful. There the Chancellor reached his decision by reviewing cases addressing whether a cross-claim relates back to the original

---

(Observing that under Delaware law, "the fact that an action first appears as a counterclaim seeking affirmative relief does not obscure the fact that it is, nonetheless, an action subject to the statute of limitations"; and that "[w]hile other states may allow late-filed counterclaims under certain circumstances, Delaware jurisprudence has consistently held that affirmative counterclaims, whether compulsory or not, are subject to the statute of limitations.").

[118]    *Id.* at *1.

[119]    *Id.*

[120]    *Id.*

[121]    The principal question presented to the Chancellor in *In re Delta & Pine Land Co.* involved the "narrow issue of how to measure the filing date of a cross-claim against a separate but related action pending in another forum to determine first-filed status." *Id.* at *4

complaint for statute of limitation purposes.[122] When doing so, the Chancellor observed that "[c]ourts have unequivocally held that a cross-claim *requesting affirmative relief, such as Monsanto's request for a declaratory judgment*, does not relate back to the original complaint."[123] The Court noted that such affirmative claims must satisfy the applicable statute of limitations, while defensive claims like recoupment generally relate back.[124]

More than three decades earlier, a predecessor Chancellor engaged a similar analysis when determining whether a counterclaim seeking affirmative relief in connection with the same transaction or occurrence which forms the basis of the plaintiff's claim is subject to a statute of limitations.[125] There the Chancellor observed, when rejecting a defendant's argument that the statute of limitations did not apply to a compulsory counterclaim for affirmative relief:

> It is generally agreed that [t]he purpose of statutes of limitation is to bar actions and not to suppress or deny matters of defense, whether legal or equitable; and it is a general rule that such statutes are not applicable to defenses, but apply only where affirmative relief is sought. . . . [T]he rule under consideration [*i.e.*, a rule forgoing enforcement of an otherwise applicable statute of limitations] applies only in the case of

---

[122]    *Id.*

[123]    *Id.* (emphasis added).

[124]    *Id.* (citing *Appelbaum v. Ceres Land Co.*, 546 F. Supp. 17, 20 (D. Minn. 1981)).

[125]    *Delaware Chemicals, Inc. v. Reichhold Chemicals, Inc*, 121 A.2d 913 (Del. Ch. 1956).

strict defenses, and in the absence of statute, does not apply to cases of set-off or counterclaim.[126]

And more recently, a federal district court explained again this consistently applied principle of Delaware claims practice:

> Under Delaware law, where a counterclaim seeks affirmative relief rather than acting merely as a defense to a plaintiff's allegations, it does not relate back to the filing of the complaint, but must independently satisfy the statute of limitations. . . . [C]ounterclaims seeking an affirmative judgment in defendant's favor are regarded as independent causes of action and may not be instituted after the applicable period of the statute of limitations has expired.[127]

Here, Coit's claims against the Turbine Defendants include Breach of Contract, Breach of the Implied Covenant of Good Faith and Fair Dealing, Unjust Enrichment, and Civil Conspiracy. Each of these counts relate to duties or obligations owed to Coit under the Letter Agreements. In response, the Turbine Defendants request that the Court declare the Letter Agreements void and unenforceable because of Coit's alleged violation of the Delaware or Texas Securities Acts. Like Monsato's cross-claim in *In re Delta & Pine Land Co.*, the Turbine Defendants' counterclaim ultimately seeks a declaration that the Turbine Defendants simply have no duty or obligation to Coit under the Letter Agreements.

---

[126] *Id.* at 918 (internal citations and quotation marks omitted).

[127] *Whitney v. Guys, Inc.*, 48 F.Supp.3d 1236, 1255 (D. Minn. 2014), *aff'd*, 826 F.3d 1074 (8th Cir. 2016)(internal citations and quotation marks omitted).

-27-

The Turbine Defendants now ask—via their "exclusively defensive counterclaim"—there be a finding that those Letter Agreements (and/or that which they govern) are "securities," that one or another state's Securities Acts control these agreements, that Coit violated those state statutes by failing to register as brokers and/or agents of brokers so as to engage in those transactions, and declare that the Letter Agreements and underlying transactions are void as a matter of law because of Coit's failure under one or the other state's Securities Act. Cast it now as they will, this "counterclaim" by Turbine Defendants is truly a distinct action for affirmative relief.[128] And "[i]t is settled law that affirmative counterclaims may not be instituted after the applicable period of the statute of limitations has expired for the reason that such claims are regarded as independent causes of action."[129]

## VII. CONCLUSION

Turbine Defendants' Securities Acts Counterclaim as pled is not one acting merely as a defense to Coit's allegations. It is instead, under these circumstances, an affirmative action under 10 *Del. C.* §§6501 *et seq.* and therefore must comply with the applicable three-year statute of limitations. Turbine Defendants' Securities

---

[128] *See F.D.I.C. v. Sanders*, 785 F. Supp. 528, 529 (W.D. Pa. 1992) (defining plaintiff's request for a declaratory judgments setting aside the disputed sale due to fraud and fraudulent conveyance as a request "seek[ing] non-monetary, affirmative relief.").

[129] *Smith-Johnson S. S. Corp. v. United States*, 231 F. Supp. 184, 186 (D. Del. 1964) (citing *Delaware Chemicals, Inc.*, 121 A.2d 913); *Di Norscia v. Tibbett*, 124 A.2d 715 (Del. Super. Ct. 1956)).

-28-

Acts Counterclaim does not. It was file well-outside of the three-year limitation. And so, it is barred.

Coit's motion to dismiss the Securities Acts Counterclaim is, therefore, **GRANTED.**[130]

**IT IS SO ORDERED.**

**Paul R. Wallace, Judge**

Original to Prothonotary

cc:    All counsel via File & Serve

---

[130]    Having granted dismissal based on the applicable statute of limitations, the Court need not address the parties' remaining arguments on the Securities Acts Counterclaim.